UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL HEAD,

                    Plaintiff,                           **DECISION AND ORDER**

              v.
                                                        6:14-CV-06546 EAW

SERGEANT MARTIN EBERT, CAPTAIN
KEVIN BROWN, C.O. ANDREW DANNHEIM,
C.O. JAMES PICHETTE, C.O. JOSEPH
KAPELKE, C.O. PAUL WEAVER, and C.O.
LLOYD NOLAN, *in their individual capacities*,

                    Defendants.
_____

UNITED STATES DISTRICT COURT
FILED
MAR 2 2 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

## INTRODUCTION

*Pro se* plaintiff Michael Head ("Plaintiff"), a prisoner in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and currently confined at the Clinton Correctional Facility, asserts various claims under 42 U.S.C. § 1983 related to an incident at the Attica Correctional Facility ("Attica") on January 22, 2014. (*See* Dkt. 98). Currently pending before the Court are Plaintiff's motion for summary judgment (Dkt. 111) and Defendants' cross-motion for partial summary judgment (Dkt. 119). For the reasons set forth below, Plaintiff's motion is denied and Defendants' cross-motion is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

At all times relevant to the instant action, Plaintiff was incarcerated at Attica. On August 29, 2013, Plaintiff sent a letter to Attica's superintendent in which he alleged that,

two years earlier, he had witnessed "more than ten officers" assaulting an inmate. (Dkt. 111-3 at 2). Plaintiff further stated that he had made a contemporaneous complaint and that, in retaliation, two officers had searched his cell and "left a mess . . . three days in a row." (*Id.*). Plaintiff went on to claim that in July 2013, he had been sent to the special housing unit (the "SHU") because he wrote a letter to his family in which he complained of mistreatment by corrections officers. (*Id.* at 3). Plaintiff's letter states that in August 2013, after he was released from the SHU, he was placed in C-Block housing and was threatened by a corrections officer. (*Id.*). Plaintiff further reported to the superintendent that in late August 2013, the water for the sinks in C-Block was turned off for more than 10 hours and the inmates were deprived of any water despite the heat and humidity. (*Id.*). Plaintiff indicated that the inmates in C-Block were frequently verbally and physically assaulted and otherwise harassed by corrections officers. (*Id.* at 5). Plaintiff's August 2013 letter does not mention any Defendant in this matter.

On October 16, 2013, Deputy Superintendent William Hughes sent Plaintiff a memorandum responding to his August 29th letter. (*Id.* at 6). Deputy Superintendent Hughes indicated that he could not comment on incidents that had allegedly occurred two years prior, that Plaintiff's complaints related to the misbehavior report that resulted in his SHU confinement should have been raised during his hearing, and that staff reported that supplies in C-Block had been issued "in accordance with schedule." (*Id.*).

On January 22, 2014, Plaintiff and several Defendants were involved in a physical altercation, the facts of which are contested. Plaintiff alleges that at approximately 5:50 p.m. on the date in question, defendants James Pichette ("Officer Pichette") and Joseph

Kapelke ("Officer Kapelke") came to his cell stating that they needed to do a cell search. (Dkt. 98 at ¶ 22). Plaintiff claims that he was "alarmed" because he was "aware that it was around this time of day that C-block officers used pretense cell searches to beat up inmates." (*Id.* at ¶ 23). At his deposition, Plaintiff testified that Officer Pichette told him to step out of his cell and that Plaintiff stepped away from the doorway and asked to see a sergeant. (Dkt. 119-3 at 166). Officer Pichette continued to tell Plaintiff to step out of the cell, and Plaintiff "started backing away from the doorway." (*Id.*). Plaintiff claims that Officer Pichette entered Plaintiff's cell and pulled out his baton, at which point Plaintiff grabbed a pen from his desk and "began screaming for [Officer Pichette] to get out [Plaintiff's] cell [sic]." (*Id.* at 169-70). Plaintiff testified that Officer Pichette then attacked Plaintiff with his baton, whereupon he swung at Officer Pichette with the pen. (*Id.* at 170). Plaintiff acknowledges that he struck Officer Pichette in the face with the pen. (Dkt. 98 at ¶ 26).

Plaintiff claims that after he struck Officer Pichette with the pen, Officer Pichette dropped his baton, grabbed Plaintiff, and held him down on the bed. (*Id.* at ¶ 27). According to Plaintiff, Officer Kapelke then entered the cell and assisted Officer Pichette in placing Plaintiff in mechanical restraints. (*Id.*). At that point, Plaintiff alleges, defendant Paul Weaver ("Officer Weaver") and defendant Lloyd Nolan ("Officer Nolan"), along with other unnamed corrections officers, entered his cell and began to punch him. (*Id.* at ¶¶ 28-29). Plaintiff also specifically alleges that Officer Pichette punched him "several times in the forehead with closed fist punches." (*Id.* at ¶ 29). Plaintiff claims that he started shouting that Officers Pichette, Kapelke, Weaver, and Nolan were trying to kill him, at

which time an unnamed officer said "that's enough, let's get him off the company." (*Id.* at ¶ 31). According to Plaintiff, he was "brought to his feet and half-carried half-dragged from his cell." (*Id.* at ¶ 32). He was then "handed to other officers" who dragged him down to the staircase and down the first flight of stairs. (*Id.*).

In Plaintiff's version of events, when he reached the second flight of stairs, he saw defendant Andrew Dannheim ("Officer Dannheim") standing at the bottom of the staircase. (*Id.* at 33). Plaintiff claims that Officer Dannheim told the officers holding Plaintiff that he "want[ed] a piece of [Plaintiff] too," whereupon the officers "slid plaintiff face first down the flight of stairs." (*Id.* at ¶ 33). According to Plaintiff, he was then dragged into the C-Block lobby and "stomped and punched by several officers as he lay on his side with his hands cuffed behind his back." (*Id.* at ¶ 34). Plaintiff specifically alleges that Officer Dannheim kicked him in the left eye and that Plaintiff thereafter became unconscious. (*Id.*). Plaintiff testified at his deposition that the next thing he remembers is waking up in the hospital. (Dkt. 119-3 at 173).

Defendants' version of the events of January 22, 2014, is very different. Defendants deny that Officer Pichette was the initial aggressor or that Plaintiff was acting in self-defense. (Dkt. 119-3 at 5). According to Defendants, defendant Sergeant Martin Ebert ("Sergeant Ebert") had authorized a search of Plaintiff's cell, but Plaintiff refused Officer Pichette's direction to exit the cell and instead grabbed a pen from his desk and immediately began to stab Officer Pichette. (*Id.*). The use of force report completed at the time of the incident states that after he was stabbed by Plaintiff, Officer Pichette used both hands to push Plaintiff backward, whereupon Plaintiff "again charged [Officer Pichette]

stabbing him." (*Id.*). Officer Pichette then allegedly grabbed Plaintiff around the chest and used "both hands" to "forc[e] a violently struggling [Plaintiff] to the bed." (*Id.*). The use of force report states that Plaintiff continued to struggle and that Officer Kapelke then struck Plaintiff twice with his baton on his left torso before grabbing Plaintiff's right arm. (*Id.*). Plaintiff purportedly kicked Officer Kapelke in the shin and attempted to stab him, whereupon Officer Weaver, who had responded to the scene, struck Plaintiff in the legs with his baton four times. (*Id.*). Officer Weaver reported that he had grabbed Plaintiff's legs but Plaintiff violently kicked himself free, causing Officer Weaver to use his own legs to hold Plaintiff's legs down. (*Id.*). Officer Nolan responded to the scene and attempted to retrieve a dropped baton, and Plaintiff struck Officer Nolan in the nose. (*Id.*). Officer Nolan then purportedly struck Plaintiff in the head four times with a closed fist, and Plaintiff responded by biting Officer Nolan's left jacket sleeve, whereupon Officer Nolan struck him again with a closed fist. (*Id.*). According to the use of force report, Officer Kapelke then took control of Plaintiff's arms and forced them behind his back, allowing Officer Weaver to place Plaintiff in mechanical restraints, and "at that point [Plaintiff] became compliant." (*Id.*).

Plaintiff was taken to the infirmary and then to Wyoming County Community Hospital after the incident and was treated for a left orbital floor fracture and loss of consciousness. (Dkt. 120-1 at 10). Plaintiff was transferred to the Erie County Medical Center for further assessment. (*Id.* at 63). He was noted to have bruises and abrasions on his extremities but no deformities. (*Id.*). Officers Pichette, Kapelke, Weaver, and Nolan were all treated for injuries after the incident. (Dkt. 119-3 at 8-120). Officer Kapelke

suffered a sprained ankle (*id*. at 9-10), while Officer Nolan suffered injuries to his nose, knuckles, wrist, neck, and back (*id*. at 21-31). Officer Pichette was taken to the emergency room with five puncture wounds and an injured hand. (*Id*. at 38). Moreover, Officer Pichette's fall onto Plaintiff's bed caused him to suffer from a herniated disc. (*Id*. at 48). Officer Weaver suffered injuries to his nose, ribs, and shoulder. (*Id*. at 120; Dkt. 111-3 at 11).

Plaintiff claims that defendant Captain Kevin Brown ("Captain Brown") falsely told the New York State Police during an investigation into the incident that Plaintiff was "conscious and uncooperative" at the time he was taken to the infirmary. (Dkt. 98 at ¶ 46). Plaintiff further claims that Sergeant Ebert did not actually authorize a search of his cell and that there is no "logbook entry" of any such authorization. (*Id*. at ¶ 37).

As a result of the incident on January 22, 2014, Plaintiff was criminally charged and ultimately convicted of two counts of assault in the second degree for his actions towards Officer Pichette. (Dkt. 119-3 at 177). Plaintiff was sentenced to seven years of incarceration on each count, to run consecutively. (*Id*.). Plaintiff was also the subject of a prison disciplinary hearing, at which he was charged with assault, refusing a frisk, possessing a weapon, violent conduct, and disobeying a direct order. (*Id*. at 174). Plaintiff pled guilty to the charges of disobeying a direct order and violent conduct and was found guilty on the counts of assault, possessing a weapon, and refusing a frisk. (*Id*.). Plaintiff was sentenced to 60 months in the SHU (12 months suspended) and 60 months loss of good time credits. (*Id*. at 161, 175).

Plaintiff commenced the instant action on September 18, 2014. (Dkt. 1). Plaintiff thereafter filed an amended complaint on June 15, 2015. (Dkt. 9). On September 19, 2016, Sergeant Ebert, Captain Brown, and Officers Pichette, Dannheim, and Kapelke filed an answer to the amended complaint. (Dkt. 19). Officers Pichette and Kapelke also asserted counterclaims against Plaintiff for assault and battery. (*Id.* at 3-7).[1]

Officers Nolan and Weaver had not been served at the time the other defendants filed their answer. (Dkt. 21). Officers Nolan and Weaver were subsequently served and defense counsel entered a notice of appearance on their behalves (Dkt. 23; Dkt. 24), but no answer to the amended complaint appears to have been filed by Officer Nolan or Officer Weaver.

On February 8, 2017, Plaintiff filed a motion for leave to file a second amended complaint. (Dkt. 48). Defendants opposed the request in part. (Dkt. 53). On July 11, 2017, United States Magistrate Judge Marian W. Payson entered a Decision and Order granting Plaintiff's request in part and denying it in part. (Dkt. 91). In particular, Judge Payson denied Plaintiff's request to the extent he sought to add new defendants but granted it to the extent Plaintiff sought to add new factual allegations regarding the incident and to modify the amount of damages sought. (*Id.* at 5). In accordance with Judge Payson's Decision and Order, Plaintiff filed an second amended complaint on August 9, 2017. (Dkt.

---

[1]     The answer purports to assert these claims on behalf of Officers Weaver and Nolan, as well. However, the answer was expressly filed only on behalf of the "Served Defendants" (Dkt. 19 at 1) which, at that time, did not include Officers Weaver and Nolan.

98). There is no indication on the docket in this matter that Defendants ever filed an answer to the second amended complaint.

Plaintiff filed a motion for summary judgment on October 24, 2017. (Dkt. 111). Defendants thereafter filed their opposition to Plaintiff's motion and a cross-motion for partial summary judgment on November 28, 2017. (Dkt. 119). Plaintiff filed a reply in further support of his motion and a response to Defendants' cross-motion on January 11, 2018. (Dkt. 127). Defendants filed a reply in further support of their motion on January 30, 2018 (Dkt. 129), and Plaintiff filed a sur-reply on February 5, 2018 (Dkt. 131).

## DISCUSSION

### I.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the

non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.     **Failure to Answer Second Amended Complaint**

As a threshold matter, the Court notes that Defendants have not filed an answer to the second amended complaint despite the fact that it was filed in August 2017. While Defendants have filed a motion for partial summary judgment, that motion was filed after the time for filing an answer had expired and, in any event, "[w]hile a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure automatically extends the time under which a defendant must file an answer, there is no parallel rule governing a defendant's obligation to answer a complaint when he files a pre-answer motion for summary judgment pursuant to Rule 56." *Hall v. Annucci*, No. 9:17-CV-1069 GTS DEP, 2018 WL 6607600, at *3 (N.D.N.Y. Nov. 7, 2018), *report and recommendation adopted*,

2018 WL 6605618 (N.D.N.Y. Dec. 17, 2018). There is therefore no valid reason for Defendants to have failed to timely file an answer to the second amended complaint.

Defendants' failure to file an answer to the second amended complaint is not fatal to their motion for summary judgment. *See Cygielman v. Cunard Line Ltd.*, 890 F. Supp. 305, 308 (S.D.N.Y. 1995) (finding that defendant who had failed to timely file an answer could nonetheless move for summary judgment because (1) "plaintiff never took, and thus waived, a default," and (2) pursuant to Rule 56, a motion for summary judgment may be made "at any time"). Nor does Defendants' failure to file an answer to the second amended complaint constitute an abandonment of the counterclaims asserted in the answer to the amended complaint. *See Yahui Zhang v. Akami Inc.*, No. 15-CV-4946 (VSB), 2017 WL 4329723, at *9 (S.D.N.Y. Sept. 26, 2017) (noting that courts have found that "counterclaims can survive a subsequent amended complaint" and that failing to reassert a counterclaim in response to an amended complaint does not waive it because "counterclaims do not need to be contained in an answer but only a pleading"); *see also Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 705-06 (D. Md. 2011) ("Plaintiffs . . . cite no case law in support of their theory that failure to reassert counterclaims when responding to an amended complaint results in waiver or abandonment of the counterclaims. . . . Several courts have held that failure to reassert counterclaims in response to an amended complaint does not waive the counterclaims or otherwise affect their viability.").

No clerk's entry of default has ever been entered against Defendants. Plaintiff also has not sought default judgment as a result of Defendants' failure to file an answer to the

second amended complaint, nor would the Court have been inclined to grant such a motion, given that the failure to answer was clearly a result of inadvertence, no prejudice to Plaintiff resulted from the failure to answer the second amended complaint, and Defendants have asserted potentially meritorious defenses to Plaintiff's claims. *See Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981) ("[T]he principal factors bearing on the appropriateness of relieving a party of a default are whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented."). Nevertheless, the lack of an answer to the second amended complaint unnecessarily procedurally complicates this case. Accordingly, the Court orders Defendants to file an answer to the second amended complaint within 14 days of entry of this Decision and Order.

III.    **The Parties' Motions for Summary Judgment**

Plaintiff seeks summary judgment as to the following claims: (1) retaliation; (2) excessive use of force; and (3) failure to intervene by Sergeant Ebert and Captain Brown. (*See* Dkt. 111-2). Defendants oppose Plaintiff's motion and seek summary judgment as to: (1) Plaintiff's retaliation claim; (2) Plaintiff's claims against Captain Brown and Officers Pichette, Kapelke, Nolan, and Weaver; and (3) Officer Pichette's counterclaims against Plaintiff. (*See* Dkt 119-5). The Court considers each of the claims at issue below.

A.    **Retaliation Claim**

Plaintiff seeks summary judgment on his claim for retaliation, arguing that Defendants assaulted him on January 22, 2014, in retaliation for the letter he sent to the Attica superintendent in August 2013, in violation of his First Amendment rights.

Defendants contend in opposition and in support of their cross-motion that there is no evidence of any causal relationship between Plaintiff's letter sent in August 2013 and the incident on January 22, 2014. For the reasons below, the Court finds that Defendants are entitled to summary judgment on this claim.

"To establish a case of retaliation in violation of the First Amendment, a plaintiff must demonstrate that: (1) he engaged in protected conduct; (2) the defendant took adverse action against him; and (3) there was a causal connection between the two." *Linares v. McLaughlin*, 423 F. App'x 84, 86 (2d Cir. 2011). The parties have focused in their briefs on the third of these elements, and so the Court will presume for purposes of assessing this claim that (1) Plaintiff's August 2013 letter constituted protected speech and (2) the alleged cell frisk and attack on Plaintiff constituted adverse action.

In considering whether there is a "causal connection between the protected speech and the adverse action, a court may consider a number of factors, including any statements made by the defendant concerning his motivation and the temporal proximity between the protected activity and the defendant's adverse action." *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quotations omitted); *see also Tuitt v. Chase*, No. 9:11-CV-0776 DNH/TWD, 2013 WL 877439, at *7 (N.D.N.Y. Jan. 30, 2013), *report and recommendation adopted*, 2013 WL 877617 (N.D.N.Y. Mar. 8, 2013) (factors relevant to a consideration of causal connection "include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation"). The Second Circuit has "held that temporal proximity

- 12 -

between protected conduct and an adverse action constitutes circumstantial evidence of retaliation," but has also "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017).

Here, the sole argument made by Plaintiff in support of his request for summary judgment on his retaliation claim is that the "close timing" of his letter to the superintendent and the incident of January 22, 2014, is evidence of retaliation. (*See* Dkt. 111-2 at 4-6). This argument is unavailing, and Defendants are correct that Plaintiff has failed to produce sufficient evidence to support a retaliation claim. "Temporal proximity alone is not sufficient for the plaintiff's claim to survive summary judgment." *Ziemba v. Thomas*, 390 F. Supp. 2d 136, 157 (D. Conn. 2005). Plaintiff has not identified, nor has the Court found in its review of the record, any other evidence that even circumstantially supports the existence of a causal connection between Plaintiff's letter and the alleged assault. To the contrary, no Defendant in this case was named in Plaintiff's letter, nor was any Defendant investigated as a result of it, and Plaintiff has produced no evidence to suggest that Defendants were even aware of his August 2013 letter.[2]

Plaintiff does generally suggest that it is questionable whether Sergeant Ebert actually authorized a search of his cell on the evening of January 22, 2014, because (1) his

---

[2]     Plaintiff states in his memorandum of law that when he first arrived on C-Block in August 2013 he was "threatened by a C-block officer who stated . . . 'over here we'll handle you.'" (Dkt. 111-2 at 2, 4-5). However, this unnamed C-Block officer is not a defendant in this case, nor has Plaintiff otherwise made any attempt to tie this alleged threat to the events of January 22, 2014.

cell had already been searched earlier that day, (2) Sergeant Ebert "contradicted" himself at Plaintiff's disciplinary hearing by stating that the search had been authorized by the watch commander, non-defendant Lieutenant Meegan (Dkt. 111-2 at 12), and (3) there is no logbook entry stating that Sergeant Ebert authorized the search. These arguments by Plaintiff do not demonstrate a causal connection between his August 2013 letter and the incident on January 22, 2014.

The Court initially notes that Plaintiff's claim that Sergeant Ebert "contradicted" himself is unsupported by the record. The transcript of Plaintiff's disciplinary hearing indicates that Sergeant Ebert reported that he authorized the search, and that he did so on instructions from Lieutenant Meegan. (*See* Dkt. 111-3 at 48). There is no inconsistency between Sergeant Ebert's statements that he authorized Officers Pichette and Kapelke to search Plaintiff's cell and his testimony at Plaintiff's disciplinary hearing that he gave that authorization pursuant to instructions from Lieutenant Meegan.

Plaintiff also has not submitted any evidence to suggest that it was impermissible for staff to search his cell twice in one day if they reasonably suspected he possessed contraband. The Supreme Court has acknowledged that cell searches are "perhaps the most effective weapon of the prison administrator in the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband." *Hudson v. Palmer*, 468 U.S. 517, 528 (1984); *see also Lashley v. Wakefield*, 367 F. Supp. 2d 461, 470 (W.D.N.Y. 2005) (noting prison superintendent's uncontested statements that in a maximum security prison, cell searches are necessary to "maintain discipline and security, and to search for weapons and contraband"). Defendants have produced records indicating that the search was based

on suspicion that Plaintiff was in possession of contraband (*see* Dkt. 47-1 at 2), and Plaintiff has failed to produce or identify any evidence to the contrary. Plaintiff's speculation that the search was impermissibly motivated is insufficient to survive a motion for summary judgment. *See Whitfield v. Imperatrice*, 477 F. App'x 806, 809 (2d Cir. 2012) (speculation as to a defendant's motivations cannot support a retaliation claim).

Finally, while Plaintiff is correct that there is no logbook entry showing that Sergeant Ebert authorized the search, Defendants have explained that logbook entries are made after the search is completed and that, in this case, the search was interrupted by the physical altercation, and so no logbook entry was made. (*See* Dkt. 103; Dkt. 119-5 at 4). The DOCCS directive that Plaintiff cites pertaining to documentation of cell searches is indeed phrased in such a way as to indicate that logbook entries are to be made after the search, not before. (*See* Dkt. 111-3 at 73 (directive provides that the logbook entry should include a "[l]ist of contraband found" and a "[l]ist of any State or inmate property damaged")). Moreover, Defendants have produced a logbook entry from January 22, 2014, that notes that Officer Pichette was stabbed by Plaintiff during a cell frisk. (Dkt. 47-6 at 2). Plaintiff has failed to produce any evidence from which a reasonable factfinder could conclude that Defendants deliberately failed to document the aborted cell search, much less that they did so because of some retaliatory intent.

No other factors support a finding of a causal connection in this case. Plaintiff did not have a prior good disciplinary record. To the contrary, Defendants have shown that Plaintiff had been found guilty at approximately 20 different disciplinary hearings (most involving multiple charges) over 15 years of incarceration. (*See* Dkt. 119-3 at 161-63).

Plaintiff also was not vindicated at a subsequent hearing but instead either pled guilty or was found guilty as to all charges. (*See id.* at 161). On the record before the Court, no rational jury could find in Plaintiff's favor on his retaliation claim. Accordingly, the Court denies Plaintiff's motion for summary judgment and grants Defendants' cross-motion for summary judgment with respect to the retaliation claim.

## B.    Excessive Force Claims

Plaintiff claims that Officers Pichette, Kapelke, Nolan, Weaver, and Dannheim all used excessive force against him on January 22, 2014, and seeks summary judgment as to those claims. Defendants oppose Plaintiff's request and argue that his excessive force claims against each of these Defendants except Officer Dannheim are barred as a result of his criminal conviction and the outcome of his disciplinary hearing, pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994) and *Edwards v. Balisok*, 520 U.S. 641 (1997). For the following reasons, the Court finds that no party is entitled to summary judgment as to Plaintiff's excessive force claims. However, at any trial of this matter, Plaintiff will be prohibited from testifying that Officer Pichette was the initial aggressor or asserting a self-defense affirmative defense and the jury will be instructed that Plaintiff assaulted Officer Pichette.

Considering first Plaintiff's motion for summary judgment, the Court finds that he has not borne his burden of demonstrating that no genuine issues of material fact exist. To the contrary, Plaintiff's excessive force claims turn almost exclusively on a question of credibility—that is, a factfinder would be called upon to determine whether Plaintiff or Defendants are telling the truth about what happened on January 22, 2014. "Assessments

of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). Plaintiff's contention that his injuries after the incident were inconsistent with Defendants' version of events does not change this conclusion. Defendants' medical expert, Dr. Jadow Rao, has submitted a sworn declaration stating that Plaintiff's injuries are not consistent with Plaintiff's version of events. (*See* Dkt. 119-4 at ¶ 22). Again, this type of factual disagreement is not amenable to resolution on a motion for summary judgment. A rational jury could find for Defendants on the record before the Court, which precludes any grant of summary judgment to Plaintiff.

Turning to Defendants' arguments based on *Heck* and *Edwards*, *Heck* bars a plaintiff from pursuing a § 1983 claim if judgment in favor of the plaintiff would necessarily imply the invalidity of a criminal conviction. *See Poventud v. City of N.Y*, 750 F.3d 121, 132 (2d Cir. 2014). However, "*Heck* does not automatically bar a § 1983 claim simply because the processes of the criminal justice system did not end up in the plaintiff's favor." *Id.* (quoting *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006)). To the contrary, "many violations of constitutional rights, even during the criminal process, may be remedied without impugning the validity of a conviction." *Id.* In *Edwards*, the Supreme Court held that the rule enunciated in *Heck* also applies to § 1983 claims that, if successful, would "necessarily imply the invalidity of the deprivation of [a plaintiff's] good-time credits." 520 U.S. at 646.

In this case, Defendants concede that Plaintiff's criminal conviction and the outcome of his disciplinary hearing do not, under *Heck* and *Edwards*, bar his claim that Officer Dannheim kicked him in the head and otherwise assaulted him after he was removed from his cell. (*See* Dkt. 119-5 at 10). However, Defendants do contend that Plaintiff cannot validly pursue any claims against Officers Pichette, Kapelke, Weaver, and Nolan for their purported actions during the altercation in his cell. (*See id.*). The Court disagrees, and notes that the Second Circuit considered a factually similar claim in *Shapard v. Attea*, 710 F. App'x 15 (2d Cir. 2017) and reached a conclusion contrary to Defendants' position.

In *Shapard*, the plaintiff claimed that three officers, including an officer named John Attea ("Attea") had "punched and kicked him and beat him with a baton." *Id.* at 16. The plaintiff had pled guilty to a criminal charge of second degree assault in connection with the incident and had admitted to injuring Attea. *Id.* at 17. The district court granted summary judgment on the plaintiff's excessive force claims based on *Heck*. *Id.* The Second Circuit reversed, finding that the plaintiff's claims did not "depend on the invalidity of his assault conviction" and that even though the plaintiff contended he had not assaulted Attea, he also contended that the amount of force used by the officers was excessive regardless of whether or not he was the initial aggressor. *Id.* at 17-18. The Second Circuit explained that "the elements of excessive force and second degree assault under [the New York Penal Law] are not incompatible," and that rather than dismissing the plaintiff's claims, the district court should have "take[n] appropriate steps to prevent [the plaintiff]

from disputing the assault, including limiting his testimony and instructing a jury that he assaulted Officer Attea." *Id.* at 18.

In this case, Plaintiff's factual allegations are in some respects inconsistent with his criminal convictions and the outcome of his disciplinary hearing. In particular, Plaintiff's contention that he was acting in self-defense cannot be reconciled with his conviction for having assaulted Officer Pichette. However, Plaintiff's actual claim, as set forth in the second amended complaint, is that Defendants "beat[] . . . [him] into unconsciousness after [he was] placed in mechanical restraints[.]" (Dkt. 98 at ¶ 57). Indeed, in his factual allegations, Plaintiff contends that Officer Pichette punched him in the head several times after he was restrained and that Officers Weaver, Nolan, and Kapelke also struck him. (*Id.* at ¶¶ 27-30).

Like the claim in *Shapard*, Plaintiff's claim of post-restraint excessive force is not necessarily incompatible with his criminal conviction, because it is entirely possible that Plaintiff assaulted Officer Pichette and was subdued and that after Plaintiff was restrained and no longer presented a threat, Officers Pichette, Kapelke, Nolan, Weaver, and Dannheim continued to hit him. *See Gilbert v. Cook*, 512 F.3d 899, 901 (7th Cir. 2008) ("A contention that a guard struck back after being hit is compatible with *Heck*. Otherwise guards (and for that matter any public employee) could maul anyone who strikes them, without risk of civil liability as long as the private party is punished by criminal prosecution or prison discipline for the initial wrong."); *Griffin v. Crippen*, 193 F.3d 89, 91-92 (2d Cir. 1999) ("[D]ismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed

and whether the guards maliciously used force against him. . . . The assault charges to which appellant pled guilty certainly cast doubt on his claim. They do not, however, preclude a reasonable jury from finding that excessive force was used against him on the day in question."). Plaintiff's excessive force claims are also not necessarily incompatible with the outcome of his disciplinary hearing—to the contrary, Plaintiff acknowledged at his disciplinary hearing that he had disobeyed an order and engaged in violent conduct, and the findings of guilty as to the weapon, assault, and refusing a frisk charges are all compatible with a version of events where Plaintiff was the initial aggressor but was attacked after he was subdued and restrained.

Defendants argue that Plaintiff's claims cannot be reconciled with his assault convictions because Officers Pichette, Kapelke, Weaver, and Nolan testified at Plaintiff's criminal trial and that "[f]or Plaintiff to emerge victorious in this case as to the events in the cell, a jury would have to believe that substantially all of the prosecution's witnesses had lied about the[] material facts." (Dkt. 119-5 at 11). However, Defendants have failed to produce any evidence as to the substance of Defendants' testimony at Plaintiff's criminal trial. This is insufficient to satisfy Defendants' burden on a motion for summary judgment. Moreover, a jury may choose to believe or disbelieve portions of testimony, and could accept Defendants' testimony that Plaintiff attacked Officer Pichette but reject their testimony that they did not hit Plaintiff after he was restrained.

The Court also is not persuaded by Defendants' argument that Plaintiff cannot pursue his excessive force claims because he maintains he acted in self-defense. The Seventh Circuit's decision in *Gilbert*, which the Second Circuit cited with approval in

*Shapard*, *see* 710 F. App'x at 18, is instructive in this regard. In *Gilbert*, a prison disciplinary board had found that the plaintiff had punched a guard while his handcuffs were being removed. 512 F.3d at 900. The plaintiff denied having struck anyone and wanted to "tell a jury his story—that the guards tripped him in the stairwell and continued the assault . . ., all without provocation." *Id.* at 901. The Seventh Circuit found that it was not necessary for the plaintiff to "confess in open court to striking a guard" in order to pursue his claims. *Id.* at 902. Instead, the Seventh Circuit held that it "would have sufficed [for the district court] to tell the jurors that [the plaintiff] struck the first blow during the fracas. . ., that any statements to the contrary by Gilbert (as his own lawyer) or a witness must be ignored, and that what the jurors needed to determine was whether the guards used more force than was reasonably necessary to protect themselves from an unruly prisoner." *Id.* The Second Circuit adopted a similar approach in *Shapard*, stating that the district court could "take appropriate steps to prevent [the plaintiff] from disputing the assault, including limiting his testimony and instructing a jury that he assaulted [the defendant guard]." 710 F. App'x at 18.

The Court finds that, like in *Gilbert* and *Shapard*, the mandate of *Heck* and *Edwards* can be fulfilled in this case by limiting Plaintiff's testimony and appropriate jury instructions. The Court notes that Plaintiff "concedes that both his affirmative defense of self-defense and any force used by defendant Pichette . . . before he was in mechanical restraints are barred by *Heck* and *Edwards*." (Dkt. 131 at 6). At any trial in this matter, the Court will prohibit Plaintiff from testifying that Officer Pichette was the initial aggressor or that Plaintiff was acting in self-defense, will instruct the jury to ignore any

- 21 -

statements by Plaintiff or any witness to the contrary, and will instruct the jury that Plaintiff assaulted Officer Pichette. These precautions will adequately protect against any potential violation of *Heck* or *Edwards*.

Finally, the Court rejects Defendants' argument that Plaintiff is "equitably estopped from arguing that his claims do not imply the invalidity of his conviction as he has testified that they do so." (Dkt. 119-5 at 10-11). Plaintiff did testify at his deposition that he wanted to use any favorable verdict in this matter to collaterally attack his criminal conviction and the outcome of his disciplinary hearing. (*See* Dkt. 119-3 at 178-79). However, Plaintiff is a layperson, unschooled in the law, and offered no plausible mechanism for how such a collateral attack could be successful. Under *Heck* and *Edwards*, the issue is not whether Plaintiff would like to undermine his criminal conviction or the outcome of his disciplinary hearing, the issue is whether a verdict in his favor would <u>necessarily</u> do so. Here, for all the reasons discussed above, the Court finds that it would not. Defendants have cited no authority for their equitable estoppel argument, nor has the Court found any in its own research.

For all the foregoing reasons, the Court finds that no party is entitled to summary judgment on Plaintiff's excessive force claims against Officers Pichette, Kapelke, Nolan, and Weaver. However, at trial, the Court will impose limitations on Plaintiff's testimony and instruct the jury as set forth above.

## C. Claims Against Sergeant Ebert and Captain Brown

Plaintiff does not contend that either Sergeant Ebert or Captain Brown directly participated in the claimed unlawful use of force against him. Instead, he seeks summary

judgment on his claim that Sergeant Ebert was "present during and observed the incident" and "failed to report plaintiff's injury or condition in his written account of the incident, and is therefore liable for failing to protect the plaintiff from correctional officers use of excessive force," (Dkt. 111-2 at 10-11), and his claim that Captain Brown made a false statement to the New York State Police that Plaintiff was "conscious and uncooperative" when he was taken to the infirmary (*id.* at 14). Defendants oppose Plaintiff's request for summary judgement on his claims against Sergeant Ebert and Captain Brown and seek summary judgment in Captain Brown's favor. (Dkt. 119-5 at 3-5).

With respect to Plaintiff's claim against Sergeant Ebert:

> To establish . . . a claim of failure to intervene, a plaintiff must prove the following four elements: (1) that a constitutional violation was being committed against the plaintiff; (2) that the officer knew, or deliberately ignored, the fact that the constitutional violation was going to be, or was being, committed; (3) that the defendant had a reasonable opportunity to intervene and prevent the harm; and (4) that the defendant did not take reasonable steps to intervene. With regard to the third and fourth elements, when considering the reasonableness of any opportunity to intervene, one must consider both (a) the duration of the constitutional violation, and (b) the defendant's presence and proximity during the use of the constitutional violation.

*Thomas v. City of Troy*, 293 F. Supp. 3d 282, 296 (N.D.N.Y. 2018) (citations omitted). The Court finds that genuine issues of material fact exist with respect to this claim. While it appears to be undisputed that Sergeant Ebert was present for at least part of the incident and escorted Plaintiff to the infirmary on January 22, 2014, as the Court has already explained, the parties have offered competing versions of what happened in Plaintiff's cell and on the way to the infirmary on that date. The viability of Plaintiff's failure to intervene claim against Sergeant Ebert rises and falls with his excessive force claims, and the Court

cannot resolve the factual disputes on a motion for summary judgment. Accordingly, Plaintiff's request for summary judgment as to his claim against Sergeant Ebert is denied.

Turning to Captain Brown, the Court agrees with Defendants that Plaintiff does not have a viable claim. The sole claim Plaintiff asserts is that Captain Brown made a false statement to the New York State Police that Plaintiff was conscious and uncooperative when he arrived at the infirmary. The Court notes that there is evidence in the record to support this statement by Captain Brown. (*See* 119-4 at ¶¶ 9-10 (Dr. Rao notes that Plaintiff was responding to external stimuli and "talking and moaning" while he was in the infirmary, which "could not have occurred if he was unconscious")). Moreover, even accepting that this statement was false, a false statement by a prison guard does not "give rise to a *per se* constitutional violation actionable under § 1983." *Johnson v. Barney*, 360 F. App'x 199, 201 (2d Cir. 2010); *see also Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986) ("[A] prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest."). Instead, the issue is whether the false report in fact caused a deprivation of the inmate's constitutional rights. *See Aghoghoubia v. Noel*, No. 17CV1927NGGSJB, 2019 WL 181309, at *8 (E.D.N.Y. Jan. 11, 2019). In this case, Plaintiff has not come forth with any evidence to suggest that Captain Brown's statement was determinative in either his criminal trial or his disciplinary hearing or that Captain Brown's statement was in any other way responsible for a deprivation of Plaintiff's constitutional rights. Under these circumstances, Plaintiff cannot pursue a claim against Captain Brown. The Court grants Defendants' motion for summary judgment with respect to this claim.

### D. Officer Pichette's Counterclaims

Finally, Defendants seek summary judgment with respect to Plaintiff's liability on Officer Pichette's state law counterclaims for assault and battery. Defendants argue that pursuant to principles of collateral estoppel and based on Plaintiff's conviction for having assaulted Officer Pichette, "the issue of his liability has been decided in a prior proceeding and cannot be disturbed." (Dkt. 119-5 at 13).

The Second Circuit has explained:

> [A] criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel . . . in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case. In order for collateral estoppel to apply the court must determine that (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.

*N.Y. v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 86 (2d Cir. 2000) (citations and quotations omitted and alteration in original).

Here, the Court agrees that Plaintiff is collaterally estopped from relitigating the issue of his assault on Officer Pichette. Plaintiff acknowledges that he was convicted of two counts of assault in the second degree for his assault on Officer Pichette. (Dkt. 119-3 at 177). In particular, Plaintiff was found guilty of having intentionally caused physical injury to Officer Pichette. (*See* Dkt. 119-3 at 147-51); *see also* New York Penal Law § 120.05(7) (under New York law, a person is guilty of assault in the second degree if "[h]aving been charged with or convicted of a crime and while confined in a correctional

facility . . . pursuant to such charge or conviction, with intent to cause physical injury to another person, he causes such injury to such person").

Officer Pichette's assault and battery counterclaims are asserted under New York law. "Under New York law, a civil assault is the intentional placing of another in apprehension of imminent harmful or offensive contact. The elements of a civil battery are (1) bodily contact, which is (2) harmful or offensive in nature, and (3) made with intent." *Doe v. Alsaud*, 224 F. Supp. 3d 286, 294 (S.D.N.Y. 2016) (citations and quotations omitted). In finding Plaintiff guilty of second degree assault as to Officer Pichette, the criminal jury necessarily found that the elements of civil claims for assault and battery were satisfied—that is, that Plaintiff intentionally made harmful conduct with Officer Pichette and that his actions placed Officer Pichette in imminent apprehension of that harmful conduct. Accordingly, Plaintiff is collaterally estopped from relitigating his liability on Officer Pichette's civil assault and battery claims. *See id.* (collecting cases wherein a criminal assault conviction was found to collaterally estop relitigation of civil assault and battery claims). The Court therefore grants summary judgment to Officer Pichette with respect to liability on his counterclaims for civil assault and battery. The issue of damages will be left to the jury.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion for summary judgment (Dkt. 111) and grants in part and denies in part Defendants' cross-motion for summary judgment (Dkt. 119). In particular, the Court grants Defendants' cross-motion with respect to Plaintiff's retaliation claim and Plaintiff's claims against Captain Brown,

and with respect to liability on Officer Pichette's counterclaims for assault and battery. The Clerk of Court is directed to terminate Captain Brown as a defendant in this matter. The remaining Defendants are instructed to file an answer to the second amended complaint within 14 days of entry of this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: March 22, 2019
Rochester, New York